IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 07-303-1 |
| | ) | |
| DWAYNE THOMPSON, | ) | |
| A/K/A WHITE CHOCOLATE, | ) | |
| A/K/A "D" | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

On February 9, 2011 defendant Dwayne Thompson ("defendant") withdrew a previously entered plea of not guilty and pled guilty to two counts in the second superseding indictment filed against him: (1) conspiracy to possess and distribute cocaine (count one); and (2) conspiracy to commit money laundering (count three). (ECF No. 829.) On August 26, 2011, defendant filed a motion to withdraw his guilty plea (ECF No. 919), and on October 31, 2011, he filed a supplemental motion to withdraw his plea (ECF No. 927). In this memorandum opinion and order the court considers defendant's request to withdraw his guilty plea.

In defendant's first motion to withdraw his guilty plea, he argued he should be permitted to withdraw his guilty plea because: (a) he claims innocence; (b) he believes he received ineffective assistance of counsel when his attorney at the time of his change of plea hearing allegedly encouraged him to plead guilty despite defendant's misgivings; and (c) defendant could not knowingly, intelligently and voluntarily plead guilty to money laundering when he did not understand the nature of the charge and when counsel for the government insufficiently stated the elements of the money laundering offense during the guilty plea colloquy. (Mot. Withdraw Guilty Plea (ECF No. 919) at 2-5.) In his supplemental motion, defendant argues he should be

permitted to withdraw his guilty plea because he did not understand the condition of his plea agreement whereby he waived his right to file a petition for post-conviction relief pursuant to 28 U.S.C. § 2255.

The court held evidentiary hearings on this matter on October 26, 2011; November 21, 2011; December 14, 2011; and February 3, 2012. Defendant testified on October 26, 2011 and November 21, 2011. Herbert Strobel, Jr. ("Strobel"), a DEA task force member, and Ed Reiser ("Reiser"), who was formerly employed by the Internal Revenue Service, both testified on December 14, 2011. Michael DeRiso ("DeRiso"), defendant's attorney at the time defendant pled guilty, testified on February 3, 2012.

During the final hearing in February 2012, the court ordered the parties to file proposed findings of facts and conclusions of law. The government filed its proposed findings and conclusions (ECF No. 952) on February 23, 2012, and defendant filed his proposed findings and conclusions (ECF No. 954) on February 27, 2012.

Upon consideration of the parties' submissions and the evidence and testimony presented at the evidentiary hearings, the court makes the following findings of fact and conclusions of law:

## I.      Findings of Fact

1.      Defendant is approximately forty-seven years old. (Hr'g Tr. Feb. 9, 2011 ("Change of Plea Transcript") (ECF No. 851) at 6.) He is a high school graduate. (Id.)

2.      Defendant was the leader of a nationwide cocaine distribution organization based in California. (Hr'g Tr. Dec. 14, 2011 ("December Transcript") (ECF No. 943) at 6.) The organization distributed cocaine to various cities throughout the United States including Pittsburgh, Pennsylvania. (Id.)

3.    In late-June 2007, during an ongoing DEA investigation of defendant's organization, defendant was stopped in his vehicle; state police discovered of 193½ pounds of marijuana in the vehicle and also found at least six kilograms of cocaine hidden in the vehicle. (Id. at 7, 15.)  Defendant was not informed that the cocaine had been discovered.  (Id. at 9-10.) Defendant's fingerprints were discovered on the cellophane wrapping the cocaine.  (Id. at 7-8.) At the request of DEA agents, local police in Texas did not charge defendant with respect to his possession of cocaine.  (Id. at 10.)

4.    In July 2007, DEA agents arrested defendant at his California home and after searching his home discovered two kilograms of cocaine.  (Id.)

5.    Subsequent to his arrest, defendant admitted that the cocaine discovered in his car in June 2007 in Texas had been destined for Indianapolis, Indiana, and Pittsburgh, Pennsylvania. (Id. at 15-16.)  Defendant admitted that between 2002 and 2007, he had obtained at least five hundred kilograms of cocaine from two sources in Southern California.[1]  (Id. at 15-16.)  William Gregory ("Gregory") was defendant's primary customer in Indianapolis for a portion of the period charged in the second superseding indictment.  (Id. at 15, 17.)  Gregory admitted to investigators that he received at least six hundred kilograms of cocaine from defendant over the course of the conspiracy.  (Id. at 20.)

6.    Defendant admitted to investing drug proceeds as a means of laundering the money.  (Id. at 18-19.)  Defendant never filed a tax return during the years 2002 through 2006. (Id. at 26.)  Reiser's investigation of defendant's finances resulted in evidence that defendant laundered at least $636,011 between 2002 and 2006. (Id. at 28-29.)  The promotional component

---

[1] Defendant's admissions were the subject of a suppression motion, which this court denied in a memorandum opinion and order dated February 8, 2010 (ECF No. 752).  See infra, ¶ 10.

of the money laundering included defendant's maintenance of a residence and storage lockers in Indianapolis, Indiana, and travel (including air, rental cars, and hotels). The concealment portion of the money laundering included multiple all-cash loans to a construction company, the attempted purchase of a nightclub in Atlanta using fictitious corporate names, the cash purchase of a $225,000 speedboat (following which, defendant filed an invoice indicating he had only spent $72,000 to buy the boat), and the lease of two Cadillac Escalades under a fictitious corporate name. (Id. at 30-32.)

7.      During part of the relevant timeframe, defendant's wife was an insurance adjuster. (Hr'g Tr. Nov. 21, 2011 ("November Transcript") (ECF No. 962) at 8.)   Defendant testified that his income during the relevant time period came from his auto detailing business. (Id. at 7-9.) He testified that he detailed approximately one to one-and-one-half cars per day, worked sporadically, and travelled "once or twice" to Pittsburgh, Pennsylvania for his auto detailing business. (Id. at 7, 30.) He testified that he earned $125 for each car that he detailed. (Id. at 30.) He testified that his auto detailing business was "mobile," meaning that he had no business address and operated the business out of his car. (Id. at 16-17.)

8.      The court finds defendant's testimony regarding his lifestyle and sources of income not to be credible. Just to finance his Indianapolis residence, travel, boat and two cars, and those of his cash investments which the IRS was able to uncover, defendant would have had to detail at least eighteen cars per week, every single week, for five and a half years. (December Transcript (ECF No. 943) at 32-33.)

9.      On March 26, 2010, a federal grand jury in the Western District of Pennsylvania returned a three-count second superseding indictment against defendant and other co-conspirators. (ECF No. 371)  Defendant was charged at count one with conspiracy to distribute

and possess with intent to distribute five kilograms or more of a mixture and substance

containing a detectable amount of cocaine, in violation of 21 U.S.C. § 846. (Id.) He was

charged at count three with conspiracy to launder monetary instruments in violation of 18 U.S.C.

§ 1956(h). (Id.)

10. Following the court's denial of defendant's three motions to suppress evidence,

See United States v. Thompson, Criminal No. 07-303-1, 2010 WL 4641663, at *1, *16 (W.D.

Pa. Nov. 8, 2010), the court granted defendant's motion for appointment of new counsel (ECF

No. 708) at a hearing on November 10, 2010.

11. On October 29, 2010, DeRiso was appointed to replace defendant's prior counsel.

(ECF No. 740.)

12. DeRiso represented defendant throughout his plea negotiations and change of plea

hearing. (Hr'g Tr. Feb. 3, 2012 ("February Transcript") (ECF No. 945) at 8-12.)

13. DeRiso is an experienced criminal attorney. (Id. at 3.) He has represented

thousands of defendants in federal and state courts. (Id. at 3-4.) He previously served as a

prosecutor with the Allegheny County District Attorney's Office. (Id. at 4-5.) He has litigated

several death penalty cases. (Id. at 4.)

14. After DeRiso's appointment, he obtained case material from Michael Ivory

("Ivory"), the Assistant United States Attorney assigned to defendant's case. (Id. at 6-7.) He

visited defendant, who was incarcerated, on multiple occasions, spending hours on each trip to

the jail working on the case with defendant. (Id. at 6.) He also spoke to defendant on the phone

multiple times. (Id. at 6-7.)

15. Upon his review of defendant's case in November and December 2010, DeRiso

became convinced that defendant was likely to receive a mandatory life sentence if the

government filed an information with the court at sentencing, under the authority of 21 U.S.C. § 851, establishing his prior drug convictions.[2] (Id. at 8.)

16.     DeRiso recounted that defendant was upset that he had been caught by authorities. (Id.)  Defendant took particular umbrage at the circumstances surrounding the June 2007 Texas vehicle stop, as well as some of the tactics used by federal investigators, such as the use of wiretaps.  (February Transcript (ECF No. 945) at 7.)  Defendant never told DeRiso that he was innocent of either drug trafficking or money laundering.  (Id.)  DeRiso and defendant discussed defendant's money laundering on several occasions.  (Id. at 11-12.)  They "talked about promotion, facilitation, concealment, [defendant's] shell companies he had, the storage locker in Indianapolis, how [defendant] would pay for things."  (Id. at 11.)  Defendant and DeRiso discussed defendant's involvement in the drug conspiracy—"[a]ll of the players, the confidential sources laid out in the application, Title III application warrants, trying to figure out who . . . the players were."  (Id. at12-13.)  They discussed defendant's waiver of his right to file a collateral attack upon his sentence "at great length" and discussed the specific appeals they wanted to exempt from the prohibition against filing an appeal in the plea agreement.  (Id. at 13.)

17.     Defendant participated in plea negotiations using DeRiso as a proxy.  (February Transcript (ECF No. 945) at 8-9.)  DeRiso testified:

> We quickly got in the routine where I would ask Mr. Thompson in
> essence: What do we have to do here to facilitate a plea?  And he
> would lay out anywhere from three to six items.  I would then
> contact [Ivory].  [Ivory] would forward me a plea with most of

---

[2] Defendant has two prior felony drug convictions for the sale of cocaine in California. (See Tentative Findings (ECF No. 882) ¶ 5.)  See generally 21 U.S.C. § 841(b)(1)(A) ("If any person commits a violation of this subparagraph or of section 849, 859, 860, or 861 of this title after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release . . . ."); United States v. Strahan, 565 F.3d 1047, 1049-50, 1053 (7th Cir. 2009) (reviewing constitutionality of a mandatory life sentence imposed where the government filed a § 851 information giving notice to the court of the defendant's two prior felony drug convictions).

> those items, whether it was items regarding the—items he wanted
> to appeal that he didn't want to give up under the general plea
> where you would give up all appellate rights; the Government
> allowed him to appeal certain rights, which is what we negotiated .
> . . . [T]here were various things which I kept coming back to
> [Ivory] for an additional item that [defendant] wanted in return for
> his plea.

(Id. at 8-9.)

18.     On January 3, 2011, Ivory faxed a plea offer to DeRiso.  (Id. at 9.)  DeRiso

communicated with defendant about the terms of the January 3, 2011 offer.  (Id. at 10.)  The

proposed plea agreement contemplated that defendant and the government would stipulate to the

amount of cocaine at issue (for sentencing purposes) being lower than the actual amount to

which defendant had previously admitted.  (Id. at 8, 10.)  The government would agree not to file

an information pursuant to § 851 (which reduced defendant's statutory minimum from life in

prison to ten years of imprisonment).  (Id. at 10.)  The government also would agree to release

from forfeiture the residence where defendant's mother lived.  (Id. at 10-11.)

19.     At some point before the change of plea hearing, defendant informed DeRiso by

telephone that he was going to accept the government's plea offer.  (Id. at

20.     At the February 9, 2011 change of plea hearing, defendant initially denied that he

wanted to change his plea to a plea of guilty:

> THE COURT:  Mr. Thompson, the Court is informed that you
> wish to change the plea you previously entered at Counts One and
> Three of a second superseding indictment to a plea of guilty to
> Counts One and Three; is that correct?
>
> THE DEFENDANT:  No.
>
> THE COURT:  So, you don't want to change your plea?
>
> THE DEFENDANT:  No.

(Change of Plea Transcript (ECF No. 851) at 2.)

21.     DeRiso was surprised by defendant's initial decision not to change his plea.  (Id.)
Because DeRiso believed the plea agreement offered to Thompson was so advantageous, DeRiso
wanted to recite the terms of the plea agreement on the record so that it was clear that defendant
had had the opportunity to consider the offer.  (Id. at 3.)  DeRiso was concerned he would be
accused of ineffective assistance of counsel for failing to communicate the terms of such a
favorable plea bargain to defendant.  (Id.)[3]  Instead of reciting the terms on the record, the court
recessed so that the parties could go into the jury room and discuss the terms of the agreement.
(Id. at 5; February Transcript (ECF No. 945) at 14.)  At first, Ivory and defendant discussed the
charges in the second superseding indictment, and the appellate rights defendant would be giving
up by accepting the plea agreement.  (February Transcript (ECF No. 945) at 15.)   Ivory left the
room and Assistant United States Attorney Mary McKeen Houghton ("Houghton") took over the
negotiations.  (Id.)  The conversation between Houghton and defendant shifted to defendant's
desire to release one of his cars from forfeiture (under the terms of the plea bargain) because he
believed he had purchased the car before he had been involved with cocaine trafficking.  (Id. at
15.)  Ultimately, defendant was able to negotiate an additional term into his plea agreement—one
thousand dollars would be deposited in his prison commissary account.  (Id. at 15-16.)
Defendant was satisfied with the thousand-dollar commissary provision, and upon obtaining that
concession, the conversation ended because defendant was ready to change his plea.  (Id. at 16.)
The conversation in the jury room primarily involved negotiations between defendant and Ivory

[3] See Missouri v. Frye, No 10-444, 2012 WL 932020, at *8 (U.S. March 21, 2012) ("This Court now holds that, as a
general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on
terms and conditions that may be favorable to the accused.  . . . When defense counsel allowed the [formal] offer to
expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective
assistance the Constitution requires.").

and Houghton.  (<u>Id.</u> at 15.)  DeRiso "sort of stayed back."  (<u>Id.</u>)

22.     The parties reconvened the change of plea hearing, and Thompson advised the court that he wished to change his plea at counts one and three to a plea of guilty.  (Change of Plea Transcript (ECF No. 851) at 5.)

23.     Defendant was sworn in.  (<u>Id.</u> at 6.)  Among other things, defendant informed the court that he was not under the influence of any drugs or alcohol.  (<u>Id.</u> at 7-8.)  The court found defendant competent to plead.  (<u>Id.</u> at 8.)

24.     Defendant indicated to the court that he was satisfied with DeRiso's representation:

> THE COURT:  Have you had ample, meaning enough, time and opportunity to discuss your case with your attorney, Mr. DeRiso?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Are you fully satisfied with the counsel, representation, and advice, given to you in this case by your attorney, Mr. DeRiso?
>
> THE DEFENDANT:  Yes.

(<u>Id.</u> at 9.)

25.     Defendant told the court that he was aware of his various trial rights which he would be waiving by pleading guilty, and that he knew he did not have to change his plea, but could persist in his defense and take his case to trial.  (<u>Id.</u> at 9-13.)  He understood that he would have to waive his right against self-incrimination and acknowledge his guilt in order to plead guilty.  (<u>Id.</u> at 13.)

26.     Defendant told the court he had received a copy of the second superseding indictment in this case and had discussed the charges with DeRiso.  (<u>Id.</u> at 13-14.)

27. Defendant told the court that he understood that he was charged at count one with conspiracy to possess with intent to distribute and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine from. (Id. at 14.) He stated that he understood the charges at count three:

> THE COURT: Now, do you understand that you are charged in Count Three of the second superseding indictment with conspiracy to launder monetary instruments from in and around 2002 and continuing thereafter to in and around July, 2007, in violation of Title 18, United States Code, Section 1956(h)?
>
> THE DEFENDANT: Yes.

(Id. at 14.)

28. Defendant acknowledged he was aware of the sentencing process, and was aware of the potential maximum and minimum penalties he was facing. (Id. at 14-19.)

29. The court reviewed the terms of the plea agreement with Ivory and defendant:

> THE COURT: Mr. Thompson, you should understand that this Court may or may not approve any plea agreement that you might enter into with the government. You have a duty disclose the existence of a plea agreement now. If you do not do so, you may not later assert there were plea negotiations or a plea agreement.
>         Have you entered into a plea agreement with the government?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Did you have an opportunity to read and discuss each of the provisions of the plea agreement with your lawyer before you signed it?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you have any questions about the plea agreement at this time?
>
> THE DEFENDANT: No.

THE COURT:  Mr. Ivory, could you please review the terms of the plea agreement for the Court and for the defendant.  [*sic*]  Please listen carefully.

MR. IVORY:  Certainly, Your Honor.  Under the plea agreement in this case, Mr. Thompson has agreed to the following.  He will enter a plea of guilty to Counts One and Three of the second superseding indictment . . . .

. . .

. . . Mr. Thompson will voluntarily forfeit to the United States all of his right, title, and interest, in properties that are subject of the civil forfeiture action in the United States District Court for the Western District of Pennsylvania at Civil Action No. 07-303, 07-1000, 07-1353, 07-1361, 07-1680, 08-135, and 08-1420.  Those are hereinafter collectively referred to as the subject of civil properties.

Mr. Thompson acknowledges that the subject civil properties are traceable to proceeds generated from cocaine distribution and in violation of Title 21, United States Code, Section 846. . . .

Mr. Thompson further acknowledges that the Exhibit A to the second superseding indictment lists properties subject to criminal forfeiture.  And those are hereinafter collectively referred to as the subject criminal properties.

He acknowledges that the subject criminal properties are traceable to proceeds generated from cocaine distribution. . . .

At the time Mr. Thompson enters his guilty plea, he will --

THE COURT:  This [section regarding the payment of a special assessment], I think, is another mistake.  I think this has to be two hundred dollars.

MR. DeRISO:  It said, seven.

MR. IVORY:  So, I'm going to correct that, Your Honor.  Again, I'm going to initial it and I'm going to ask Mr. DeRiso to initial it.

THE COURT:  This is because, as a matter of law, when there's a guilty plea to a count, there's a hundred dollars that has to be paid as a special assessment.  That's for each count.  So, it has to be a hundred dollars for each, meaning two hundred dollars.

MR. IVORY:  That's not waive-able [*sic*] by law.

MR. DeRISO:  So many aspects of this plea agreement and those

minor ones.

MR. IVORY:  Mr. Thompson will pay a special assessment --

THE COURT:  Has that been initialed by everyone?

MR. IVORY:  Yes, it has, Your Honor.  In the amount of two hundred dollars. . . .

Mr. Thompson has also waived his right to take a direct appeal from his conviction or sentence under 28 United States Code, Section 1291, or Title 18, United States Code, Section 3742, subject to the following exceptions.  If the United States appeals from the sentence, then Mr. Thompson may take a direct appeal from the sentence.

Mr. Thompson may also take an appeal if the sentence exceeds the applicable statutory limits set forth in the United States Code or if the sentence unreasonably exceeds the Guideline range determined by the Court under the Sentencing Guidelines.

Also, as a condition of Mr. Thompson's guilty plea, Mr. Thompson may take a direct appeal from his conviction limited to the following issues raised in the following motions, motion to dismiss indictment with prejudice for violation of the Speedy Trial Act, motion to suppress electronic surveillance, motion to suppress documentary evidence, motion to suppress statement, motion to suppress search warrants, and motions to suppress evidence from a Texas traffic stop.

If Mr. Thompson takes a direct appeal raising these issues and prevails in the appeal, he may withdraw his guilty plea.  If he does not take a direct appeal or does not prevail in the appeal, the plea of guilty shall stand.

Under these reservations the right to appeal on the basis of these specified issues does not include the right to raise issues other than those specified.

Mr. Thompson also waives his right to file a motion to vacate sentence under Title 28, United States Code, Section 2255, attacking his conviction or sentence and the right to file any other collateral proceedings attacking his conviction or sentence.

THE COURT:  I just want to go over this last paragraph with you, Mr. Thompson.  Do you understand that by entering into the plea agreement, you are giving up very significant rights with respect to your ability to file an appeal?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that there's only going to be four situations in which you can take an appeal?

THE DEFENDANT:  Yes.

THE COURT:  The first situation is if the United States appeals, and there's no restriction on the United States ability to appeal, then you could take a direct appeal.  You understand that?

THE DEFENDANT:  Yes.

THE COURT:  And the second situation in which you could take an appeal is if the Court were to impose a sentence that exceeds the applicable statutory limits.  Remember, just a few minutes ago I went over what those statutory limits were?

THE DEFENDANT:  Yes.

THE COURT:  Then, if the Court has a sentence that exceeds those, then you can take an appeal.

THE DEFENDANT:  Yes.

THE COURT:  And the third situation is if after the Court determines what your Guideline range would be, the Court would impose a sentence that unreasonably exceeds that Guideline range, then you could appeal?

THE DEFENDANT:  Yes.

THE COURT:  And the fourth and final situation in which you can take an appeal has to do with motions that you filed in this case.  Under this agreement you are going to be entitled to appeal any or all of the decisions that were rendered by this Court with respect to the identified motions.

THE DEFENDANT:  Yes.

THE COURT:  You understand that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  So, if your situation that you want to appeal doesn't fall within one of those four situations, you understand that you are not going to be able to appeal that matter?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand that you are totally, completely giving up your right to come back at a later time and try to, what we call collaterally attack your conviction or sentence?

THE DEFENDANT:  Yes.

THE COURT:  So, that means that if you don't have a right to appeal within the limitations that you've set forth here, you're not going to be able to challenge that matter?

THE DEFENDANT:  Yes.

THE COURT:  Also, you understand that if you do take an appeal within these four situations that were set forth, if you take an appeal and you lose the appeal, you're not going to be able to come back and try to later attack the Court's decision.

THE DEFENDANT:  Yes.

THE COURT:  I mean, naturally, you would be able to appeal up to the Supreme Court if you chose to, but your appeal would be filed.  And if you lost on the appeal, you can't come back later and try to collaterally attack your conviction or sentence.

THE DEFENDANT:  Okay.  Yes.

THE COURT:  Do you have any questions about that?

THE DEFENDANT:  I'm kind of cloudy on it still.

THE COURT:  What?

THE DEFENDANT:  I'm a little bit cloudy.

THE COURT:  On what?  What collateral means?

THE DEFENDANT:  I understand what the collateral portion of it means, but as far as --

THE COURT:  What you can appeal?

THE DEFENDANT:  I understand there's four issues that --

THE COURT:  Well, there's all these motions that are identified. You can file an appeal with respect to any of the issues raised in these motions.

THE DEFENDANT:  Right . . . So, let me ask you this.  If I can file an appeal, I could go to all four issues.  What rights am I actually giving up or am I waiving as far as appeal portions?

THE COURT:  Well, if the Court makes a decision in sentencing, it doesn't have anything to do with these four motions and you wouldn't fall within A or B, which would be the government's appeals, or the sentence exceeding the statutory limits, or unreasonably exceeds the Guideline range.

If there's something else that the Court does at the time of sentencing that you feel should be appealable, you're not going to be able to appeal that.  You have given that up.

MR. DeRISO:  If it's not listed, it's waived.

THE COURT:  I don't know what it could be you're talking about or if there's something else out there where you have raised a motion as to do X, Y, or Z, and you want to challenge that, you know, that's not something you're going to be able to raise.

THE DEFENDANT:  Okay.

THE COURT:  Later, it has to fall within what's identified here. But, clearly, you know, anything that was in one of these motions, any of the issues raised in those motions, you're going to be able to appeal.

Is that correct, Mr. Ivory?

MR. IVORY:  That is correct, Your Honor.

THE COURT:  Have any other questions about this?

THE DEFENDANT:  No.

THE COURT:  Are you willing, Mr. Thompson, to give up and are you willing to agree to these limitations on your rights to appeal and totally give up your right to collaterally attack the conviction or sentence for the benefits of the plea agreement?

THE DEFENDANT:  Yes.

MR. IVORY:  May I continue?

THE COURT:  Yes, you may.

MR. IVORY:  The government has agreed to the following, Your Honor.

Prior to sentencing, the government will orally or in writing recommend that pursuant to Section 3E1.1 of the Sentencing Guidelines that this Court reduce the offense level of Mr. Thompson by two levels to reflect the fact that he has accepted responsibility in this case.

The government has agreed not to file an information under Title 21, United States Code, Section 851.  And I earlier referenced that we will not be filing such a motion.

Prior to sentencing, the government will orally or in writing recommend to the Court that the base offense level of Mr. Thompson is now adjusted under Section 2D1.1(b)(1), Chapter 2, of the Sentencing Guidelines that deals with possession of a weapon during the drug conspiracy.

Prior to sentencing, the government will also orally or in writing recommend to the Court that the offense level of Mr. Thompson not be increased under Section 3B1.1, that is a leadership or aggravating role in the offense.

The recommendation is not binding on the Court, but the government will make those recommendations.

The United States Attorney will take any position he deems appropriate in the course of any appeal from the sentence or in response to any post-sentencing motions.

The government has also agreed that physical evidence in this case will be maintained and preserved in the pendency of the appeal.  The government will also release from forfeiture the property located at [an address] in Alta Dena, California and will pay Mr. Thompson one thousand dollars from money under the civil forfeiture seizure.  The parties have agreed to --

THE COURT:  When does that take place?

. . .

MR. IVORY:  . . . My understanding is it will be placed in Mr. Thompson's commissary account at the institution he's currently incarcerated at.

THE COURT:  Okay.

16

MR. IVORY:  So, the government and Mr. Thompson have agreed that the following maximum penalties that may be imposed under this case at Count One are as follows.  A term of imprisonment of not less than ten years and not more than life, a fine of $4 million, a term of supervised release of at least five years, and a special assessment of one hundred dollars.

The maximum penalty that may be imposed at Count Three is a term of imprisonment of not more than twenty years, a fine of five hundred thousand dollars, or twice the property involved in the transactions, whichever is greater, a term of supervised release of three years, and a special assessment of one hundred dollars.

The parties acknowledge that since the maximum penalty for an offense to which Mr. Thompson is pleading guilty is punishable by twenty-five years or more, he is not eligible for a sentence of probation.

The parties have further stipulated and agreed the type and quantity involved of drugs in this case attributable to Mr. Thompson is more than fifty kilograms, but less than one hundred fifty kilograms.  This stipulation includes any and all relevant conduct under Section 1B1.2 of the Sentencing Guidelines.

The parties understand that this Court, under Title 21, United States Code, Section 862, has the discretion to order that Mr. Thompson be made ineligible for a period of five years for all federal benefits as defined in Section 862(d).  This agreement does not preclude the government from pursuing any civil or administrative remedies against Mr. Thompson or his property.

The parties also agree and understand that Mr. Thompson's guilty plea to Count Three of the second superseding indictment is limited only to the promotional prong of --

THE COURT:  What does that mean?

MR. IVORY:  Your Honor, in this case, the money laundering conspiracy charges that Mr. Thompson and other individuals were engaged in certain financial transactions.  That the purpose of these transactions were two-fold.  Some were intended to promote the drug-trafficking activities at section -- in the drug conspiracy charged in the first count of the indictment.

Other financial transactions were involved with the concealment of the ownership, origin, nature of the drug moneys involved.

Mr. Thompson and the government agree it's limited to the promotional prong.  Those would be financial transactions that were intended in whole or in part to promote the drug conspiracy.

17

THE COURT:  But not concealing.

MR. IVORY:  That's correct, Your Honor.
       The parties further agree that Mr. Thompson is not precluded from seeking a two-level downward [departure] if Mr. Thompson's base offense level is increased by virtue of his plea to Count Three of the second superseding indictment. . . .
       . . .
       . . . That would be the, basically, a summary.

THE COURT:  Just one other thing I wanted to bring up.  This is in paragraph 3 on that same page 6, where it's talking about the stipulation about the amount of drugs involved.  There's a recognition in there that is not binding on the Court and it wouldn't preclude the parties from bringing . . . to the attention of the Probation Office, or the Court, any information that was not within their knowledge at the time the agreement is executed.

MR. IVORY:  That is correct.

THE COURT:  Okay.

MR. IVORY:  Thank you, Your Honor.  I do have a signed copy of the plea agreement.

THE COURT:  Mr. DeRiso, did Mr. Ivory correctly state the terms of the plea agreement?

MR. DeRISO:  Yes, he did, Your Honor.

THE COURT:  Mr. Thompson, I just want to go over the last paragraph right before your signature on the plea agreement.  That paragraph says that you received a letter from your attorney, Mr. DeRiso.  Is that true?

THE DEFENDANT:  Yes.

THE COURT:  It said that you read it and discussed it with him.  Is that true?

THE DEFENDANT:  Yes.

THE COURT:  It said that you accept and acknowledge that it fully sets forth your agreement with the office of the United States

Attorney for the Western District of Pennsylvania. Is that true?

THE DEFENDANT: Yes.

THE COURT: It says also that you are affirming there were no additional promises or representations made to you by agents or officials of the United States in connection with this matter. Is that true?

THE DEFENDANT: Yes.

THE COURT: Mr. Thompson, did you hear the terms of the plea agreement that were just reviewed by Mr. Ivory?

THE DEFENDANT: Yes.

THE COURT: Do you understand the terms of the plea agreement?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions about the plea agreement at this time?

THE DEFENDANT: No.

THE COURT: Mr. Thompson, has Mr. Ivory correctly stated the terms of the plea agreement as you understand them?

THE DEFENDANT: Yes.

THE COURT: Do you understand that the terms of the plea agreement are merely recommendations to the Court and that I could reject the recommendations without permitting you to withdraw your guilty plea and could impose a sentence that is more severe, meaning greater, than you expect?

THE DEFENDANT: Yes.

THE COURT: Mr. Thompson, has anyone made any promise to you, other than the promises made in the plea agreement, that induced you to plead guilty?

THE DEFENDANT: No.

> THE COURT:  Has anyone made any promise or assurance that is
> not in the plea agreement to persuade you to accept the plea
> agreement?
>
> THE DEFENDANT:  No.
>
> THE COURT:  Has anyone threatened you or anyone else in any
> way to persuade you to accept the plea agreement?
>
> THE DEFENDANT:  No.
>
> . . .
>
> THE COURT:  Have you been instructed by the government
> attorney, your attorney, or anyone else, to respond untruthfully to
> any question that [the] Court has asked you?

(Sealed Hr'g Tr. Feb. 9, 2011 ("Sealed Change of Plea Transcript") at 22-39.)

     30.    During the colloquy, defendant admitted his guilt at both counts of the indictment:

> THE COURT:  Mr. Thompson, did you commit conspiracy to
> possess with intent to distribute five kilograms or more of a
> mixture and substance containing a detectable amount of cocaine, a
> Schedule II controlled substance, from in and around 2001 and
> continuing thereafter to in and around July, 2007, in violation of
> Title 21, United States Code, Section 846, in violation as set forth
> in Count One of the second superceding [*sic*] indictment?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Did you commit conspiracy to launder monetary
> instruments from in and around 2002 and continuing thereafter to
> in and around July, 2007, in violation of Title 18, United States
> Code, Section 1956(h), as set forth in Count Three of the second
> superseding indictment?
>
> THE DEFENDANT:  Yes.

(Change of Plea Transcript (ECF No. 851) at 20-21.)

     31.    Ivory reviewed the elements of each offense, as well as the government's

evidence as to each count:

THE COURT:  Mr. Ivory, could you review the elements [of] those offenses?

MR. IVORY:  Certainly, Your Honor.  I'll start with the Section 846, the drug conspiracy.  The government would have to prove the following essential elements beyond a reasonable doubt.

First, that two or more persons came to a mutual understanding or agreement to try to accomplish a common and unlawful plan to distribute and/or possess with the intent to distribute the controlled substance charged in the second superseding indictment.

Secondly, that the defendants knowingly and willfully became members of such a conspiracy.

Thirdly, that cocaine is a schedule II controlled substance.

Fourthly, and finally, that the conspiracy had the specific unlawful purpose of distributing and/or possessing with the intent to distribute five kilograms or more of cocaine.

To prove the money laundering --

THE COURT:  Just a second.  Did you hear the elements of the offense at Count One?

THE DEFENDANT:  No.

THE COURT:  I want you to review them again.  You have to listen carefully.

MR. IVORY:  First, that two or more persons came to a mutual understanding or agreement to try and accomplish a common and unlawful plan to distribute or to possess with the intent to distribute cocaine.

THE COURT:  That's the first element.

MR. IVORY:  The second element would be that the object of or the purpose of the conspiracy of distributing or possessing with intent to distribute involved five kilograms or more of cocaine.

Do you understand those elements, sir?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions about those elements?

THE DEFENDANT:  No.

THE COURT:  Okay.

MR. IVORY:  To prove the money laundering conspiracy, the government would have to prove that a conspiracy to launder money is charged in the superseding indictment was entered into by two or more people.

Secondly, that the defendants knew the purpose of the conspiracy.

And, thirdly, that the defendants deliberately joined that conspiracy.

Do you have any questions concerning that offense, sir?

THE DEFENDANT:  No.

THE COURT:  Do you understand those elements?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Ivory, could you now please review the government's evidence as to these counts?

MR. IVORY:  If this matter had proceeded to trial, the government would have presented the following.

THE COURT:  Just a minute.  You have to -- the defendant has to listen.  Do you need to talk?

MR. DeRISO:  No, Judge.  I'm sorry.

MR. IVORY:  The government would introduce the following evidence that is pertinent to the first count in the second superseding indictment, that is the drug conspiracy.

The government would have presented evidence that showed that Mr. Thompson supplied cocaine to a group of dealers who distributed the cocaine in Beaver County.  This group was referred to as the Cali Connect, because members of the group lived in Southern California.

Members of the group would fly to the Pittsburgh area and await the delivery of cocaine.  At first, originally, Ronald Garner was responsible for transporting the cocaine.  However, in March of 2002, members of the Oklahoma State Highway Patrol stopped the vehicle Mr. Garner was operating and discovered eleven kilograms of cocaine in there.

Mr. Garner was charged in federal court in the District of Oklahoma and Mr. Thompson became the individual who was

responsible for transporting.

THE COURT:  Are you talking about Mr. Dwayne Thompson?

MR. IVORY:  Mr. Dwayne Thompson.

THE COURT:  You have to be very careful because we do have Mr. Dwayne Thompson's brother is also a co-defendant.

MR. IVORY:  That's correct.  And Mr. Dwayne Thompson became responsible for transporting the cocaine.

At various points during the time frame charged at Count One, Mr. Dwayne Thompson would drive from California transporting the cocaine in one of his vehicles or  in a rental vehicle.

He would meet with members of the Cali Connect at various locations here in western Pennsylvania.  Individuals at that time included Sekou Cooks, Barron Voorhies, and Ricky Riley.  Mr. Dwayne Thompson would often front the cocaine to these and individuals, other individuals.  That is to mean that it was consigned and the recipient would then distribute the cocaine to individuals that they themselves were supplying.  Sometimes Mr. Thompson, Mr. Dwayne Thompson, would wait for the money owed to him from the consigned cocaine.  He would wait in the area.  Other times, he would retrieve the money on the next supply trip.

As the investigation unfolded, it was learned that cocaine was being, was also being distributed in Detroit, Michigan and in Indianapolis, Indiana.  And William Gregory sold cocaine in Indianapolis.  He received his cocaine from Mr. Dwayne Thompson.  Mr. Gregory and Mr. Dwayne Thompson maintained separate apartments at a complex located on the North Side area of the City of Indianapolis.

A cooperating witness would testify that he saw multiple kilograms of cocaine in Mr. Dwayne Thompson's apartment.

And another cooperating witness would have testified that he traveled to the apartment with Mr. Dwayne Thompson and, upon arrival, Mr. Dwayne Thompson removed two kilograms of cocaine from the tailgate area of his pickup truck and took them into the apartment.

Another cooperating witness would have testified that he received multiple kilograms from Mr. Dwayne Thompson in Indianapolis.

Other cooperating individuals here in the Western District of Pennsylvania likewise would have testified that they, too,

received multiple kilograms of cocaine from Mr. Dwayne Thompson at various points during the course of the conspiracy.

Now, at one point, Ricky Riley was convicted on a federal firearms offense. He was incarcerated. Mr. Cooks and Mr. Voorhies filled the void caused by Mr. Riley's absence and he continued to receive cocaine from Mr. Dwayne Thompson which they distributed here in western Pennsylvania. Mr. Riley renewed his association with Mr. Dwayne Thompson once Mr. Riley was released from prison.

In July of 2005, individuals associated with the Cali Connect were arrested in Ohio and two kilograms of cocaine were seized from their vehicle. This cocaine had also been supplied by Mr. Dwayne Thompson.

As the investigation progressed in the spring of 2007, DEA received authorization to monitor and record conversations occurring over Mr. Riley's cell phone. A number of drug-related conversations between Mr. Dwayne Thompson and Mr. Riley were intercepted. During one such conversation which occurred on June 21, 2007, Mr. Dwayne Thompson --

THE COURT: Just a minute. Just a minute.

You have to wait. Defendant has to listen. You can take a moment to do whatever.

MR. DeRISO: He's listening. He was just writing a note. Are you listening?

THE DEFENDANT: Yes. I'm listening.

THE COURT: Okay.

MR. IVORY: June 21, 2007, there was a conversation between Mr. Dwayne Thompson and Mr. Riley. Mr. Dwayne Thompson was berating Mr. Riley about not having obtained a new cell phone. Mr. Thompson was berating Mr. Riley about not having obtained a new cell phone. Mr. Thompson, Mr. Dwayne Thompson, expressed concerns that Mr. Riley's phone had been compromised and made the following statement. Listen, find you another phone. Throw that mother fucker away. Conspiracy. You don't understand.

In late June of 2007 Joe Livermore, a trooper with the Texas State Highway Patrol, stopped a pickup truck that Mr. Dwayne Thompson was operating. The truck was searched and the officers found a large amount of marijuana that was in the bed of the pickup truck. Mr. Thompson was arrested and taken into

custody.  The local DEA office was contacted.

The DEA in Texas consulted a data base [*sic*] and learned that Mr. Dwayne Thompson was the subject of a wiretap investigation out of the Pittsburgh office.  Contact between the two offices was made and the DEA from Texas were instructed to search the tailgate area of Mr. Dwayne Thompson's truck.  They did and discovered seven kilograms of cocaine.

Information obtained from the wiretap made it possible for the DEA in Pittsburgh to conduct surveillance of Mr. Dwayne Thompson when he was in the area.  It was through this investigative technique that it was learned that Mr. Dwayne Thompson stored drugs in the tailgate of his pickup truck.

The surveillance and the Title III wiretap information also enabled the agents to conduct surveillance of Mr. Dwayne Thompson and Ricky Riley whenever they would interact.  One such surveillance occurred in June of 2007.  It was later learned that two kilograms of cocaine had been exchanged and delivered.

Back to the Texas traffic stop.  Mr. Dwayne Thompson made bond, but he was not informed about the discovery of the cocaine.  In July of 2007, the DEA obtained a search warrant to search Mr. Thompson's residence.  The warrant was executed on July 18, 2007.

Mr. Dwayne Thompson was present when the search warrant was executed.  The agents found two kilograms of cocaine in the residence.  Mr. Dwayne Thompson was advised of his Miranda rights.  Later that day, Mr. Dwayne Thompson admitted to supplying cocaine to Gregory and Riley and stated that he was aware of the cocaine found in the tailgate of the pickup truck.  That's concerning the Texas stop in June that he knew that there was cocaine in the tailgate.

Finally, the parties have stipulated that the amount of cocaine is more than fifty kilograms, but less than one hundred fifty kilograms.

With respect to Count Three of the second superseding indictment, the government would have introduced evidence that Mr. Dwayne Thompson did not file any income tax returns during the time period reflected in the indictment.  He did not have a known legitimate source of income.  As noted, Mr. Dwayne Thompson rented an apartment in [an] Indianapolis complex known as Springs.  Government witnesses would testify that cocaine had been stored there.

It is the government's position that the Indianapolis apartment functioned as a distribution hub for the conspiracy, as well as a weigh station for Mr. Dwayne Thompson as he drove around the country making his cocaine deliveries.

Subpoenaed evidence revealed that Mr. Dwayne Thompson expended a total of thirty-nine thousand seven hundred nineteen dollars and forty-two cents to maintain the apartment.

Mr. Dwayne Thompson also spent money on air travel, rental cars, and hotel expenses.  This was in connection with activity pertinent to the drug conspiracy.  The travel was to and from Indianapolis, Pittsburgh, Atlanta, and Southern California.  Again, these expenditures were made in connection with the drug conspiracy activities.

Between 2003 and 2007, Mr. Thompson spent thirty-eight thousand nine hundred twenty-five dollars and forty cents on air travel.  During that same time period, 2003-2007, he spent twenty-two thousand seven hundred eighty-eight dollars and ten cents on various car rentals and he spent nine thousand seven dollars and thirty-five cents on hotel rentals from 2003 to 2007.  And, again, numerous occasions those hotels were here in western Pennsylvania and marked situations by Mr. Dwayne Thompson had come into Pittsburgh to either drop off cocaine or retrieve drug money.

So, the total amount of money spent on travel, rental, and hotel expenses is seventy thousand seven hundred twenty dollars and eighty-five cents.  And, again, those were financial transactions that were designed in part or in whole to further the drug trafficking activities, Your Honor.

THE COURT:  Mr. Thompson, did you hear the prosecution summary about what you did?

THE DEFENDANT:  Yes.

THE COURT:  Do you agree with the prosecution summary of about what you did?

THE DEFENDANT:  Yes.

THE COURT:  Do you still wish to plead guilty?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand you do not have to change your plea?

THE DEFENDANT:  Yes.

THE COURT:  Mr. DeRiso, is the entry of a guilty plea consistent

with your advice?

MR. DeRISO: Absolutely, Your Honor.

(Id. at 21-31.)

32. The court accepted defendant's guilty plea at counts one and three and entered a judgment of guilty on defendant's plea. (Id. at 31.) Defendant signed a form changing his plea of not guilty to a plea of guilty at the hearing on February 9, 2011. (ECF No. 829.)

33. After the court had already accepted his plea and entered a judgment of guilty on the plea, defendant, as he was signing the change of plea form, asked the court "if say, for instance, two days from now I want to change my mind[, or] I want to change withdraw my plea? Can I do that?" (Change of Plea Transcript (ECF No. 851) at 32.) The court instructed him to speak with his attorney. (Id.) After allowing defendant an opportunity to speak to DeRiso, the court read the plea form signed by defendant onto the record. (Id.) Defendant acknowledged he had signed the document. (Id.) The court ordered the probation office to produce a pre-sentence investigative report, advised the parties about the scheduling of defendant's sentencing, and adjourned the hearing. (Id. at 32-35) Defendant did not testify about the contents of his off-the-record conversation with DeRiso. DeRiso did not specifically remember the contents of that conversation, but testified that it was "not even remotely possible" that he would have told defendant he would be able to withdraw his plea. (February Transcript (ECF No. 945) at 36.) DeRiso when questioned by the court about the off-the-record conversation, stated: "Your honor, I remember this taking place. I do not remember me saying anything to him about his ability to withdraw his plea if he so chose. That would be inconsistent with what I know to be true." (Id. at 41.)

34. The plea agreement signed by the parties during the change of plea hearing

included the thousand-dollar commissary provision negotiated that day.  (<u>Id.</u> at 17.)  In addition to the commissary provision, and the government concessions included in the January 3, 2011 plea offer, the government agreed not to seek an adjustment pursuant to United States Sentencing Guideline § 2D1.1(b)(1), pertaining to the weapons found in defendant's storage locker in Indianapolis, Indiana.  (<u>Id.</u> at 18.)  The government agreed not to seek an adjustment for defendant's leadership role in the drug trafficking conspiracy.  (<u>Id.</u>)  The government further agreed, upon DeRiso's request, to limit the money laundering conspiracy only to the promotional aspect of the money laundering, and not to pursue the concealment aspect.  (<u>Id.</u> at 18-20.)

     35.     Defendant submitted a letter to the court indicating he regretted his decision to change his plea, and requesting the court permit him to withdraw it.  (ECF No. 834.)  The letter is dated February 9, 2011, but was not filed with the court until February 14, 2011.  (<u>Id.</u>)  Defendant wrote the letter because he felt he had "taken the wrong direction . . . in his plea colloquy."  (<u>Id.</u> at 1.)  He wrote that he wished to withdraw his guilty plea because he was not satisfied with the outcome of the plea negotiations:

> The plea negotiation that has transpired, I feel was not in my best interest, the waiver of a possible 2255 motion or any collateral attack, along with the other safeguards that I have lost by taking this plea was a very big mistake.
>
> …I wish to withdraw from my plea decision that I have made.  I have come to this conclusion this morning not more than 15 hrs after my decision.
>
> In reflecting on all that I have just signed away, I feel in my heart that I have left myself unprotected and have lost the basic substance to my case to the plea negotiations that was so well orchestrated both by Mr. Ivory and Mr. DeRiso.
> …I am asking [the court] to reconsider my actions and let me Dwayne Thompson withdraw my plea so that I may secure a proper appeal with all of my rights.

(Id. at 1-2.) At no point in the letter did defendant claim to be innocent of the crimes to which he had pleaded guilty, and he did not indicate he had been misled or confused during the change of plea proceedings. (Id. at 1-3.) Instead, he indicated that he changed his mind, and that he regretted the decision he had previously made.

36.     On February 17, 2011, the court denied the defendant's motion to withdrawn (contained in the letter) without prejudice because defendant was represented by counsel and referred the matter to his attorney. (ECF No. 838.)

37.     On February 18, 2011, the court received a handwritten "Motion to Withdraw Plea" from defendant. Defendant argued that the accusations made by the government were "only 'stated,' and . . . ha[d] not been proven beyond a reasonable doubt." (Id. at 2.) Defendant listed the following facts which believed were not proven beyond a reasonable doubt: "(a) 'the Cali Connect Crew'; (b) A.K.A. names 'White Chocolate'[4]; (c) the weapons for the 2 point inhancement [sic]; (d) drug transactions and drug quantity; (e) stash houses/storage units; (f) the stipulate [sic] amount of money in the money laundering count. $70,000.00 how much of these funds were used in the state of Pittsburgh." (Id.) Defendant complained that the government had not proven beyond a reasonable doubt that the weapons seized from the storage facility "were used in the comission [sic] of a drug related offence or crime of violence." (Id.) Defendant raised objections relating to the government's failure to prove the stipulated amount of the drugs involved in the case. (Id. at 3.) Defendant raised an objection to the government's representation of his criminal history and the offense level for the crimes to which he had pleaded guilty. (Id.)

38.     In defendant's February 18, 2011 pro se motion, with respect to his waiver of the

_____

[4] The docket indicates that defendant's street name or alias is "White Chocolate."

right to file a § 2255 petition, he wrote:

> The waiving of my right to collaterally attack with the 28 U.S.C. §
> 2255 motions
>    1) To challenge any and all jurisdictional issues
>    2) To challenge any state convictions used to enhance a
>       federal sentence
>    3) The claim of ineffective assistance of counsel against
>       my first attorney Mr. Richard C. Schomaker Esq.
>    4) Any and all constitutional violations and safeguards
>       that comes [*sic*] with this case by going to trial.

(Id. at 4.)  With respect to the money laundering charges, defendant did not claim he was

innocent of money laundering; instead, he challenged whether this court had jurisdiction over his

money laundering that had occurred in other states:

> The amount of proceeds that was stated/stipulated by the U.S.
> Attorney Mike Ivory during the colloquy, some $70,000 00 US, in
> count one (1) and three (3) of the superseding indictment, is
> charging money laundering transactions violating 18 USC § 1956
> and/or 1957.  These transactions are questionable due to the
> jurisdictional issues in this case.
>    1) Hotel accommodations (In the State of PA)
>    2) Flights (To the State of PA)
>    3) Rental Cars (In the State of PA)

(Id.)  Most of defendant's objections seemed to be based on his legal determination that the

district court sitting in Pittsburgh, Pennsylvania lacked jurisdiction to consider criminal activity

that he committed in other states.  (Id. at 1-5)  He also stated that the one-thousand-dollar

commissary provision he negotiated into his plea agreement had been a "bribe."  (Id. at 5.)  At no

point in his pro se motion, did defendant write that he was innocent, or that he had not

understood what was happening at his change of plea proceedings.  (Id. at 1-5.)

     39.     On March 3, 2011, the court denied the motion without prejudice and again

referred the matter to defendant's counsel.  (ECF No. 840.)  Defendant subsequently filed a pro

se motion for the appointment of new counsel.  (ECF No. 847.)  At a hearing on March 17, 2011,

the court granted that motion. (See March 17, 2011 Minute Entry (ECF No. 850).) Defendant was appointed new counsel, who renewed his motions to withdraw his guilty plea.

40.     At the October 26, 2011 evidentiary hearing held on this matter, defendant testified regarding his recollection of the change of plea hearing. Defendant's testimony was frequently contradicted by the record and by the testimony of DeRiso. The court credits the testimony of DeRiso and discredits the testimony of defendant. Contrary to DeRiso's testimony, defendant testified that he first saw the plea letter he was offered on the day of his change of plea hearing. (Hr'g Tr. Oct. 26, 2011 ("October Transcript") (ECF No. 929) at 17.) The court credits the testimony of DeRiso that defendant had had an opportunity to review the plea offer before the hearing.

41.     Relying on DeRiso's testimony, the demeanor of defendant, and the record from the change of plea hearing, and finding defendant's statements to the contrary not credible, the court finds that defendant was fully aware of the appeal rights he was giving up as part of his plea bargain when he did so. The court finds that defendant was aware that he was only going to be able to appeal in four situations. The court finds that defendant knew he would not be able to file any other appeals or collateral proceedings, including habeas corpus petitions.

42.     Defendant was asked to "tell the Court why [he] said [he] was guilty during the change of plea hearing if it was not in fact, true?" (Id.) He responded that he "was pretty much convinced by Mr. DeRiso and Mr. Ivory when [they] went to the jury room." (Id.) Later, when asked the same question, defendant responded: "Because -- I don't know. I just feel that -- that I was manipulated or persuaded into pleading guilty. And the accusations that I think Mr. Ivory or the Government is saying is -- is -- is suspect. It's just stipulations." (Id. at 24.) He was asked the question a third time by his attorney:

Q:      . . . And, again, you still need to answer the question . . . why did you come in here and tell the Judge you were guilty?

A:      Mr. DeRiso was very convincing.

Q:      In what way?

A:      Um, um, it's so hard -- I mean he -- explained to me that this was, like he said, a phenomenal deal and I should take it and I'm not going to get anything better than what's already on the table.  If I don't, I'm going to get life in prison.

Q:      But that still doesn't explain why you came in here and essentially, you know, and for lack of a better word, lied to the Judge when you said that you were guilty.  If that wasn't true, why did you say it?

A:      Um, I don't know.  I kind of think that -- that's probably why I -- I want to take my plea back, because it wasn't right.

Q:      Okay.  In what way or what do you mean it wasn't right?

A:      Because -- I mean I -- I felt that when I talked to Mr. DeRiso in the back room, he was like: Look, if you plead guilty to this, I'll make sure you get a chance to speak with your brother before you guys leave, or we can arrange it or do something beforehand.  But we just need you to worry about this today, and we'll take care of everything later on.
          And after I did plea, I was kind of hesitant.  I really didn't want to plea, even during colloquy; but then after I got back and I remembered some of the stuff that went on in the colloquy, I researched it really quick.  I was like that -- that was wrong.  I shouldn't have never even -- the plea is more weighted toward the Government than it is for me to even benefit off it.

(Id. at 34-36.)

43.      When pressed for more concrete explanations, defendant responded that "they don't have money, they don't have drugs in the State of Pittsburgh."  (Id. at 25.)  When pressed further, defendant elaborated several complaints regarding the techniques utilized by investigating officers: he believed an informant had lied about whether he was in possession of

cocaine (id.); he believed that officers were lying when they testified (presumably during his

suppression hearings) that his fingerprints were found on the cocaine in his truck (id.); he

believed the police officers had lied about using GPS tracking of his cell phone to monitor his

location (id. at 27); and he believed the police had mischaracterized the amount of time it took to

drive between his house and the police office on the day the police searched his office (id. at 36).

With respect to the money laundering aspect of the case, defendant insisted he was not guilty

because all the items he purchased—cars, real estate—were "in [his] name." (Id. at 32.)  He

admitted that he had given money to a co-conspirator for her to open a business, but denied that

he expected to receive any money back or that it was an investment.  (Id.)

      44.     Defendant admitted to drug trafficking, but contested the amount of cocaine for

which he was responsible:

> Q:     If somebody explained to you the relationship between the
> sentencing guidelines and the amount of the drugs, would you have
> entered your plea?
>
> A:     No.
>
> Q:     Okay.  And you're going to have to tell the Judge how that
> would have changed your mind.
>
> A:     Um, because the -- the amount of drugs that's stated or that
> was stipulated [in the plea agreement], the 50 to 150 versus the
> five to fifteen that's on the indictment, the range would have been
> lower; and by being 50 to 150, it's making it a 36 -- and it's
> entirely too high, and it's locking it in as to where it can't be
> departed from or made less than.
>
> Q:     Okay.  And it's your position that you may be accountable
> for five to fifteen kilos, but certainly not 150.
>
> A:     Correct.

(Id. at 42.)

45.     Defendant consistently failed to give coherent explanations for why his testimony during the multiple hearings on his motion to withdraw his guilty plea differed from his testimony during the waiver and plea hearing.  (<u>E.g.</u>, November Transcript (ECF No. 962) at 17-20.)  At the hearing in November 2011, defendant testified that he was not lying during his change of plea hearing.  (<u>Id.</u> at 14.)  He testified that he misunderstood the full extent of the rights he was giving up by accepting his plea deal.  (<u>Id.</u> at 17.)

46.     Defendant reiterated during the November 2011 hearing that knew he was pleading guilty to drug dealing, but that he had issues with the stipulated amount of drugs in his plea deal.  (<u>Id.</u> at 20.)  Defendant admitted that he transported drugs during the time charged in the indictment.  (<u>Id.</u> at 22.)  Defendant had significant difficulty answering short, direct questions, and had difficulty clarifying his position:

[BY MR. IVORY:]

Q:      So, Mr. Thompson, I understand your testimony on redirect, your contention is more so with the stipulation of 50 to 150 kilograms of cocaine as opposed to you just being a drug dealer?

A:      I didn't say I was a drug dealer.

Q:      Are you a drug dealer -- were you a drug dealer?

A:      No.

Q:      No, okay.  So -- never sold any drugs.

A:      Hum -- do I have to answer that question?

THE COURT:  Yes, you do, unless it's some other offense, then you can take the fifth.

THE WITNESS:  Would you repeat that again?

BY MR. IVORY:

Q:      Did you ever sell drugs?

THE COURT:  Why don't you put it in this time frame, please.

BY MR. IVORY:

Q:      Between 2002 and 2007 did you ever sell drugs?

A:      No.

Q:      Did you ever transport drugs?

. . .

A:      Yes.

. . .

Q:      So you carried drugs?

A:      Yes.

Q:      What were you going to do with those drugs?

A:      Uh-huh-uh.

MR. IVORY:  Your Honor, may the record reflect that there was a
pause of approximately 23 seconds before Mr. Thompson
answered my question?

THE COURT:  The record will so reflect.

BY MR. IVORY:

Q:      So you didn't know what you were going to do with the
cocaine found in your truck, that you had in your truck.

…

A:      I never knew anything about any cocaine that was found in
my truck in Texas.

Q:      What about the 193 pounds of marijuana, what were you
going to do with that, smoke it?

A:      Um, hold onto it.

(Id.)

47.     Based upon defendant's demeanor, his manner, his style of speech and his choice of words, the court finds that defendant is an intelligent individual, who fully understood the charges against him and that he voluntarily and intelligently admitted his guilt during the change of plea hearing.

## II. Conclusions of Law

### A.  Legal Standard for Motions to Withdraw

1.      Federal Rule of Criminal Procedure 11(d) provides that "[a] defendant may withdraw a plea of guilty or nolo contendere: (1) before the court accepts the plea, for any reason or no reason; or (2) after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal."  FED. R. CRIM. P. 11(d).

2.      In determining whether "the defendant can show a fair and just reason," id., the court must examine each of the following three factors: (1) whether the defendant asserts his or her innocence; (2) whether the government would be prejudiced by the withdrawal; and (3) the strength of the defendant's reason to withdraw the plea.  Brown, 250 F.3d at 815 (citing United States v. Huff, 873 F.2d 709, 711 (3d Cir. 1989)).

3.      Because Rule 11(b)(3) of the Federal Rules of Criminal Procedure requires the court to be satisfied as to the defendant's guilt before accepting a guilty plea, in order to demonstrate a "fair and just reason" to withdraw the plea, the "defendant must . . . not only reassert innocence, but *give sufficient reasons to explain why contradictory positions were taken*

*before the district court* and why permission should be given to withdraw the guilty plea and reclaim the right to trial." United States v. Jones, 979 F.2d 317, 318 (3d Cir. 1992) (emphasis added), superseded by statute on other grounds as stated in , United States v. Roberson, 194 F.3d 408, 417 (3d Cir. 1999). Conclusory reassertions of innocence are insufficient to permit the withdrawal of a guilty plea. Brown, 250 F.3d at 818. Instead, the defendant must "buttress" the claim of innocence with "facts in the record that support a claimed defense." Id. If the defendant fails to give sufficient explanation why he previously admitted guilt, the court will presume that the previous admission of guilt was truthful and that the current denial of guilt is fraudulent. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.").

4. "A simple shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to force the government to incur the expense, difficulty and risk of trying a defendant, who has already acknowledged his guilt before the court." Jones, 979 F.2d at 318; accord Brown, 250 F.3d at 815. The court should not permit a defendant to withdraw a guilty plea for merely tactical reasons. United States v. Hyde, 520 U.S. 670, 676-77 (1997).

5. "The district court retains a great deal of discretion to deny" a motion to withdraw a plea of guilty. Jones, 979 F.2d at 318.

6. Defendant bears the burden of demonstrating a "fair and just" reason for withdrawal. United States v. Jones, 336 F.3d 245, 252 (3d Cir. 2003) ("Jones II"). Because the court did not accept his plea tentatively, see Hyde, 520 U.S. at 676-77, defendant's burden of establishing a sufficient basis for withdrawal is "substantial." Jones II, 336 F.3d at 252. This

heavy burden reflects the notion that "[o]nce accepted, a guilty plea may not automatically be withdrawn at the defendant's whim." Brown, 250 F.3d at 815 (citing United States v. Martinez, 785 F.2d 111 (3d Cir. 1986)).

7.    As will be explained below, defendant did not meet his burden of demonstrating a fair and just reason for withdrawal of his guilty plea. Each of the three factors the court must consider favors denial of the motion. The court will, therefore, deny defendant's motion, considering each of the three factors in order.

## B.  Meaningful Reassertion of Innocence

8.    The first factor is whether defendant asserts his innocence. Defendant has not made a meaningful assertion of innocence.

9.    His explanation that DeRiso and Ivory were persuasive is not credible and is belied by the weight of the evidence in the record. Specifically, the record established that defendant participated in long and drawn-out plea negotiations, and that he was able to obtain multiple, advantageous conditions in exchange for his ultimate agreement to plead guilty. Defendant was not manipulated, and the plea deal was neither forced nor rushed. The court credits DeRiso's testimony that defendant played the lead role in his plea negotiations, he was aware of the terms on which he was pleading guilty, and he was voluntarily and knowingly doing so.

10.    When pressed for more specifics with respect to DeRiso's persuasiveness, defendant responded that DeRiso had told him he had been offered a phenomenal deal and that he should accept it. Defense attorneys are obligated to give advice and counsel to their clients during plea negotiations. Defendant, during the plea colloquy acknowledged that he was fully satisfied with DeRiso's advice. Defendant was facing a mandatory life term of imprisonment if

he went to trial and was found guilty. Based upon the summary of the government's evidence, which defendant acknowledged and with which he agreed, the court must conclude that there was substantial evidence of his guilt and DeRiso's concerns about the risk of life imprisonment for defendant were well founded. A non-erroneous legal opinion regarding the quality of a plea deal does not amount to constitutionally impermissible coercion, such that defendant's guilty plea was involuntary.

11. Defendant's other proffered explanation for his innocence—that this court lacks jurisdiction and that he cannot be guilty of a crime in the Western District of Pennsylvania when the government has not proven he possessed drugs there beyond a reasonable doubt—is not credible. He acknowledged the drugs were destined for Western Pennsylvania and elsewhere. He pled guilty to a conspiracy which involved the transportation to and selling of drugs in Western Pennsylvania. He agreed during his plea colloquy that "during the time frame charged at Count One, Mr. Dwayne Thompson would drive from California transporting the cocaine in one of his vehicles or in a rental vehicle [and that] he would meet with members of the Cali Connect at various locations here in western Pennsylvania." (Change of Plea Transcript (ECF No. 851) at 24-25.)

12. Defendant's failure to mention his actual innocence in either of the pro se filings he submitted to the court following his change of plea hearing undermines his later assertion that he desires to withdraw his guilty plea because he is actually innocent.

13. The record contains an overwhelming amount of evidence tending to show defendant's guilt. Because defendant failed to give a sufficient explanation why he previously admitted his guilt, the court concludes that the previous admission of guilt was truthful and that the current denial of guilt is fraudulent. See Blackledge v. Allison, 431 U.S. 63, 74 (1977)

14.     With respect to the drug charges, not only did defendant fail to make a meaningful assertion of his innocence, he admitted he was guilty of cocaine trafficking during the hearing on his motion to withdraw his guilty plea.   He agreed that it was his "position that [he] may be accountable for five to fifteen kilos, but certainly not 150."  (Hr'g Tr. Oct. 26, 2011 ("October Transcript") (ECF No. 929) at 42.)   Similarly, his first motion to withdraw challenged the government's proof with respect to the quantity of drugs for which he was responsible without disputing that he was a drug dealer in the first place, undermining defendant's later assertion of innocence.  (ECF No. 823 at 3.)

15.     With respect to the money laundering charge, defendant's attempt to buttress his reassertion of innocence with factual proof failed.  He could not credibly explain how he could afford to finance his lifestyle, which included the purchase of a luxury boat and cars.  He could not refute the evidence presented by the government that he was concealing his illicit funds through all-cash investments and other purchases, and that he was investing money in the promotion of his criminal enterprise.  The court credits DeRiso's testimony that defendant was aware of the legal meaning of money laundering.  The colloquy supports his knowledge about the elements of the money laundering.  Ivory, in reviewing the terms of the plea agreement, noted that the money laundering conspiracy charge would be limited to the promotional prong and, upon the court's questioning, described the promotional prong and the concealment prong. The court notes that defendant's explanation that all of his purchases were "in [his] name" is both contradicted by the record and immaterial.

16.     The first factor, defendant's attempt to reassert his innocence, weighs heavily in favor of the court rejecting the defendant's motion to withdraw his guilty plea.

## C. Prejudice to the Government

17.     The second factor is whether there would be prejudice to the government.

18.     "Increased cost and inconvenience to the government are grounds for finding prejudice, as are the diminished memory and incentive to cooperate of Government witnesses." United States v. Fazio, No. 02:09-cr-0325-06, 2011 WL 6780926, at *9 (W.D. Pa. Dec. 27, 2011).

19.     "[T]he Government need not show such prejudice when a defendant has failed to demonstrate that the other factors support a withdrawal of the plea." U.S. v. Jones, 336 F.3d 245, 255 (3d Cir. 2003).

20.     The court concludes that prejudice to the government does exist.  Allowing defendant to withdraw his guilty plea would prejudice the government.  The case involves allegations of illegal conduct ending in 2007, nearly five years ago.  Requiring the government to proceed to trial after such a delay, which was extended due to defendant's indecision regarding his guilty plea, would work a hardship on the government.  The lead investigator in the money laundering case has since retired, and memories may have faded.

21.     The second factor weighs in favor of denying the motion to withdraw the guilty plea.

## D. Defendant's Reasons for Withdrawal

22.     The third factor is the strength of defendant's reasons for withdrawal of his guilty plea.

23.     The court finds, notwithstanding defendant's arguments to the contrary, that the primary reason defendant wishes to withdraw his guilty plea is that he regrets some of the concessions he made in his plea agreement.  In his first letter to the court indicating he wished to

withdraw his plea, he did not claim innocence. He did not claim that he misunderstood the terms of his plea agreement when he entered his plea. Instead, he wrote that he regretted his decision, that the plea bargain was not in his best interest, and that he had changed his mind the day after he entered a guilty plea. Merely changing one's mind about the terms of the plea bargain is not a sufficient basis to withdraw a validly entered guilty plea. Jones, 979 F.2d at 318.

24.     In that letter, defendant acknowledged that he changed his mind only *after* the plea colloquy. This admission bolsters the conclusion that defendant's guilty plea was knowing and voluntary.

25.     Defendant's three arguments for withdrawal will be addressed in order below.

*i. Ineffective Assistance of Counsel During the Plea Negotiations*

26.     Defendant's first argument is that he received ineffective assistance of counsel from DeRiso.

27.     "Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" Hill v. Lockhart, 474 U.S. 52, 56 (1985) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)). In the context of petitions for post-conviction relief, a defendant must also establish that he was prejudiced by his attorney's performance, meaning "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 58. The Court recently clarified that prejudice may also be demonstrated by a showing a reasonable probability that (a) defendant would have accepted an earlier, more favorable plea offer, and (b) if the prosecution had the discretion to cancel the plea agreement or the trial court had the discretion to refuse to accept it, neither would

have prevented the offer from being accepted or implemented. <u>Missouri v. Frye</u>, 132 S. Ct. 1399, 1409-10 (2012).

28. The court concludes DeRiso provided effective counsel and representation to defendant. DeRiso's representation did not fall below an objectively acceptable standard of competence. He obtained a favorable plea bargain, involving substantial concessions made by the government, and there is no credible evidence in the record that he erroneously advised defendant. After concluding DeRiso's representation was constitutionally competent, the court need not assess the prejudice component of the ineffective assistance analysis. In any event, prejudice cannot be shown in light of the strength of the evidence against defendant and the likelihood that, with the filing of a § 851 information, he would face a mandatory term of life in prison.

29. Defendant's first reason for withdrawal is weak. Because defendant did not receive ineffective assistance of counsel, his argument that the advice of his counsel should persuade the court to permit his to withdraw his guilty plea is without basis. His guilty plea did not involve any ineffective representation, which might impact the voluntariness and intelligence (in the Constitutional sense) of his guilty plea.

*ii. Plea Colloquy and Elements of the Offense*

30. Defendant's second reason involves his claim that he was not properly advised of the elements of the money laundering offense during the plea colloquy.

31. Federal Rule of Criminal Procedure 11(b)(1) provides in relevant part:

> Before the court accepts a plea of guilty or nolo contendere, the defendant may be placed under oath, and the court must address the defendant personally in open court. During this address, the court must inform the defendant of, and determine that the defendant understands, the following:

. . .

> (G) the nature of each charge to which the defendant is
> pleading. . . .

FED. R. CRIM. P. 11(b)(1)

32. Under Rule 11, a court need not provide "a litany or other ritual" that would elevate "ceremony . . . over substance." United States v. Cefaratti, 221 F.3d 502, 508 (3d Cir. 2000). Instead, a reviewing court "look[s] to the totality of the circumstances to determine whether a defendant was informed of the nature of the charges against him, considering factors such as the complexity of the charge, the age, intelligence, and education of the defendant, and whether the defendant was represented by counsel." Id. Rule 11 itself provides that "[a] variance from the requirements of this rule is harmless error if it does not affect substantial rights." FED. R. CRIM. P. 11(h)

33. The court concludes, under the totality of the circumstances, that defendant was informed of the nature of the charges against him. He was represented by counsel, with whom he had extensive conversations regarding the charges against him, including conversations about the money laundering charge. Ivory explained the difference between the promotional and concealment prongs of money laundering. Defendant is an intelligent man. Defendant directed a large-scale, nationwide drug distribution conspiracy, and clearly—based upon his practice running that organization—understood the concept of promoting his illegal business using illegal proceeds, and in investing cash proceeds into legitimate business as a means of concealment. Moreover, to allow defendant to withdraw his plea because of a formalistic argument would be to elevate form over substance over form. Defendant understood the elements of conspiracy to commit money laundering, agreed with the government's summary of the evidence against him

44

during the plea agreement, and the overwhelming evidence in the record indicates he was guilty of conspiracy to commit money laundering.

*iii. Knowing Waiver of § 2255 Rights*

34.     Defendant's third and final reason is that he did not understand he was waiving his right to file a habeas corpus petition.

35.     As the court has found as a matter of fact that defendant was aware he was waiving the right to file a § 2255 petition when he pled guilty, and that he was aware he would only be permitted to appeal in four scenarios, defendant's final reason to withdraw his guilty plea is weak. He acknowledged that he was agreeing to limit his rights to appeal and completely giving up his right to attack collaterally his conviction and sentence for the benefits of the plea agreement. These were significant benefits—especially the government's agreement not to file a § 851 information, which could have increased the mandatory minimum term of imprisonment from ten years to life.

36.     Because defendant did not present the court with a meaningful, well-articulated or factually sound basis to show he did not understand the rights he was giving up, and, as explained above, because defendant's other two reasons for withdrawing his guilty plea were similarly weak, the third factor the court must consider in determining whether to exercise its discretion in allowing defendant to withdraw his guilty plea weighs in favor of denying defendant's motion.

## III. Conclusion

For the above reasons, because all three factors weigh in favor of denying the motion, and particularly because defendant's attempted assertion of innocence was so ineffectual, the court finds that defendant did not show a fair and just reason for the withdrawal of his previously

entered guilty plea. The court will, therefore, deny defendant's motion to withdraw his guilty plea and the supplemental motion to withdraw his plea.

*ORDER*

AND NOW, this 1st day of May, 2012, for the reasons set forth in the opinion above, it is hereby ORDERED that defendant Dwayne Thompson's motion to withdraw his plea of guilty (ECF No. 919) and supplemental motion to withdraw his plea of guilty (ECF No. 927) in the above-captioned case are DENIED.

By the court:

 /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge